IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| DANIELLA[1] E., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 1:20cv01414 (CMH/JFA) |
| | ) |
| ANDREW M. SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## REPORT AND RECOMMENDATION

This matter is before the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on cross-motions for summary judgment. (Docket nos. 17, 20). Pursuant to 42 U.S.C. § 405(g), plaintiff seeks judicial review of the final decision of Andrew Saul, Commissioner of the Social Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The Commissioner's final decision is based on a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of Appellate Operations ("Appeals Council") that plaintiff was not disabled as defined by the Social Security Act and applicable regulations from March 9, 2016 through January 16, 2020.[2]

---

[1] The complaint lists plaintiff's first name as Daniella. It appears her first name is actually Daniela.

[2] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 14). In accordance with those rules, this report and recommendation excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

## I. PROCEDURAL BACKGROUND

Plaintiff signed an "Appointment of Representative" form on January 17, 2017 authorizing Andrew Mathis to represent her with respect to her claims. (AR 101). In January 2017, plaintiff applied for DIB with an alleged onset date of March 9, 2016. (AR 216–18). The Social Security Administration ("SSA") initially denied plaintiff's application on June 26, 2017. (AR 69–81). Plaintiff requested reconsideration of the denial on August 2, 2017 (AR 113), which the SSA denied on February 15, 2018 (AR 83–97). On February 20, 2018, plaintiff requested a hearing before an ALJ. (AR 121–22). The Office of Disability Adjudication and Review acknowledged receipt of plaintiff's request on March 13, 2018 (AR 123–25), and on July 22, 2019, the Office of Hearing Operations scheduled a hearing before an ALJ for October 11, 2019 (AR 145).

On October 11, 2019, ALJ Anne Sharrard held a video hearing where plaintiff appeared in Washington, D.C. while the ALJ presided over the hearing from Chicago, Illinois. (AR 36). Plaintiff appeared with Andrew Mathis, a non-attorney representative. (AR 36, 38). A vocational expert also participated by telephone. (AR 36, 38–39). Plaintiff provided testimony and answered questions posed by the ALJ and plaintiff's representative. (AR 41–62). A vocational expert also answered questions from the ALJ and plaintiff's representative. (AR 62–66). On January 16, 2020, the ALJ issued her decision finding that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from March 9, 2016 through the date of her decision. (AR 10–24). Later that month plaintiff filed a request for review with the Appeals Council. (AR 214–15). The Appeals Council denied the request on September 16, 2020 finding no reason under its rules to review the ALJ's decision. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. (AR 1).

2

On November 18, 2020, plaintiff timely filed this civil action seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (Docket no. 1). On January 15, 2021, the Commissioner filed a consent motion for extension of time to file the administrative record and a responsive pleading, which was granted that day. (Docket nos. 7, 9). On March 17, 2021, the Commissioner filed another consent motion for extension of time, which was granted that day. (Docket nos. 11–12). On March 25, 2021, the parties filed a joint motion for briefing schedule, which was granted on April 1, 2021. (Docket nos. 15–16). The case is now before the undersigned for a report and recommendation on the parties' cross-motions for summary judgment. (Docket nos. 17, 20).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court will affirm the Commissioner's final decision "when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). It is "more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Id.* (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In determining whether a decision is supported by substantial evidence, the court does not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Id.* (alteration in original) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). It is the ALJ's duty to resolve evidentiary conflicts, not the reviewing

3

court, and the ALJ's decision must be sustained if supported by substantial evidence. *See Smith v. Chater*, 99 F.3d 635, 638 (4th Cir. 1996).

## III. FACTUAL BACKGROUND

### A.    Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1963 and was 56 years old at the time of the ALJ hearing on October 11, 2019. (AR 41). She graduated high school in soviet Czechoslovakia. (AR 43–44). Plaintiff worked in sales support at retail businesses from 2003 to 2016 at Victoria's Secret and TJ Maxx. (AR 46, 249, 265). Plaintiff worked for Victoria's Secret Stores, Inc. from 2003 to 2004. (AR 222, 237). In 2005, plaintiff worked for TJX Companies, Inc. and for Limited Brands Store Operations, Inc. *Id.* From 2006 to 2016, plaintiff worked at TJX Companies, Inc. (AR 223–24, 238–39). Plaintiff has no subsequent work history. (AR 224, 239).

### B.    Plaintiff's Medical History[3]

Prior to providing a summary of the relevant treatment notes for before and after plaintiff's alleged disability date, an overview of the treatment provided by plaintiff's primary case physician, Dr. John K. Kim, and the treatment provided by specialists relating to her cervical spine complaints will be given in order to give some perspective to the records contained in the summary.

#### i. Dr. John K. Kim, Plaintiff's Primary Care Physician

From August 8, 2015 to March 22, 2018, plaintiff saw Dr. Kim eight times. (AR 323–329, 419). Many of the handwritten portions of Dr. Kim's relevant treatment notes from those

---

[3] The AR contains over 115 pages of medical and treatment records from various sources relating to plaintiff's medical conditions. This summary provides an overview of plaintiff's treatments and conditions relevant to her claims and is not intended to be an exhaustive list of every treatment.

appointments are difficult to decipher other than "Cervical DDD" (degenerative disc disease) and "Cervical HNP" (herniated nucleus pulposus). *Id.* Dr. Kim does appear to have noted that plaintiff was unable lift more than ten pounds multiple times. (AR 323–24, 326, 328). Dr. Kim also appears to have noted that plaintiff reported pain at nine out of ten during at least four visits, although no other information regarding the pain is provided or legible. (AR 323–26). Plaintiff did report ten out of ten right leg and/or foot pain with sudden movement during one visit, although it was in the context of three days of frequent and painful urination that Dr. Kim thought might indicate a urinary tract infection. (AR 327). The ALJ noted that Dr. Kim assessed plaintiff to have four out of five strength in the bilateral extremities at a few of these appointments. (AR 17). Although the numerals "4" and "5" are legible in those notes, nothing surrounding those numerals is clear. (AR 324–27). Plaintiff also complained of weakness in her arm and hands, including dropping cups and spoons in a November 2015 appointment. (AR 325). Dr. Kim noted that he recommended full disability in most of these notes but did not provide any detail concerning the reasoning behind that recommendation. (AR 323–29).

The notes for plaintiff's visits with Dr. Kim in August 2018, and in January and August 2019 are more legible. (AR 413–18). During those visits Dr. Kim consistently noted plaintiff's complaints of weakness in both arms and 10/10 intermittent neck pain. *Id.* Dr. Kim assessed plaintiff to have cervical degenerative disc disease and herniated nucleus pulposus with severe left radiculopathy and weakness, and he recommended plaintiff follow-up with neurosurgery if the conditioned worsened. (AR 413, 415, 417). In each of these visits, plaintiff reported that she did not want to undergo surgery at that time and there is no evidence plaintiff ever underwent surgery for her cervical spine issues. (AR 413, 415, 417, 50–51, 61–62). Dr. Kim noted that plaintiff's opioid medication could cause drowsiness and memory and judgment impairments;

5

that plaintiff reported frequently dropping cups and items from her hands; and assessed that plaintiff was unable to do basic household chores. *Id.* Dr. Kim found that plaintiff had poor bilateral fine motor movements in January 2019 and noted consistently that her pain kept her from sleeping well. (AR 413, 415, 417). The notes from the visits in January and August 2019 indicate 4/5 bilateral strength in the upper extremities. (AR 413, 415).

As discussed in detail below, Dr. Kim provided two medical source statement forms in March 2017 and August 2019, and a letter in September 2018 on plaintiff's behalf. (AR 333–36, 406, 408–11).

### ii. *Specialists' Treatments for Plaintiff's Cervical Spine Complaints*

In December 2015, Dr. Seyed B. Kalantar, a spine surgeon in the Department of Orthopaedics at the Georgetown University Hospital, diagnosed plaintiff with cervical spondylotic myeloradiculopathy based on plaintiff's reported symptoms and the imaging performed during that visit. (AR 345–48). Dr. Kalantar recommended surgery and noted that plaintiff's cord compression was causing her symptoms and would worsen over time if left untreated. (AR 345–46, 348). In January 2017, plaintiff was assessed by a physician's assistant supervised by Dr. Beverly A. Whittenberg at National Spine Pain Center, to have myalgia (myofascial pain syndrome), cervical disc displacement at the C5–C6 level, and cervicalgia. (AR 321–22). Plaintiff was recommended for a cervical epidural, but because the epidural was steroid based and plaintiff reported a potential allergic reaction to a steroid, plaintiff was referred for allergy testing. (AR 322). Dr. Talal M. Nsouli assessed that plaintiff was likely not allergic, and it appears plaintiff never provided a sample for Dr. Nsouli to confirm or refute that assessment through testing. (AR 402–04). In October 2017, Dr. Kalantar diagnosed plaintiff with cervical arthritis with myelopathy and again recommended surgery. (AR 349–50).

6

     *iii.*    *Summary of Plaintiff's Medical History Prior to Alleged Date of Disability[4]*

On November 13, 2015, plaintiff had an MRI of her cervical spine (referred by Dr. Kim) because of her neck and arm pain and arm weakness. (AR 309–10, 337–38). Dr. Carlos Artiles found the C5–C6 disc was broadly protruding and, along with endplate osteophytes, was causing moderate cord compression and bilateral foraminal stenosis. *Id.* On December 10, 2015, plaintiff filled out an intake questionnaire at the Medstar Georgetown Department of Orthopaedic Surgery. (AR 339–343). Plaintiff indicated that her "problem" was located in her neck, arm, and leg; that her problem had started in 2011; that standing and bending forward aggravated the pain while sitting relieved the pain; that anti-inflammatory and narcotic pain medications had been helpful while physical therapy had been both helpful and unhelpful; and plaintiff had not used muscle relaxants, a chiropractor, epidural block/injection, facet block/injection, trigger point injection, acupuncture, or traction. (AR 339–340). Plaintiff reported that she had undergone an MRI of her spine and an electromyography test ("EMG"), and had been using ibuprofen, oxycodone, and pantoprazole since 2013. (AR 340–341). Regarding her past medical history, plaintiff noted that she had wrist surgery in 2003 for a cyst but had no history of anesthesia reactions and no history of surgical complications. (AR 343).

---

[4] The ALJ found plaintiff had the severe impairments of cervical degenerative disc disease/spondylosis with C5-6 disc protrusion causing moderate central canal stenosis and cervical myeloradiculopathy. (AR 12). There were several other ailments plaintiff alleged from anxiety and depression to GERD, atopic dermatitis, fibromyalgia, and arthritis in her shoulders and arms, among other things. (AR 12–13, 16). Plaintiff's sole argument in this proceeding is based on the ALJ's consideration of Dr. Kim's medical opinions in the residual functional capacity analysis. (Docket no. 18 at 6–11). Plaintiff has not raised any issue relating to the severe impairment analysis in step 2. (AR 333–36, 406, 408–11). Accordingly, the discussion of plaintiff's medical history will be generally limited to the impairments the ALJ found to be severe.

On December 14, 2015, plaintiff presented to Dr. Kalantar at Medstar Georgetown University Hospital Department of Orthopaedics for an initial neck pain evaluation: plaintiff reported a several year history of worsening neck pain and burning that went into her hands despite extensive rounds of physical therapy; plaintiff also reported increased clumsiness and numbness in her hands and that she was occasionally dropping things, but that her gait was not affected. (AR 345–46). Plaintiff was taking ibuprofen as needed, oxycodone-acetaminophen as needed, and protonix (pantoprazole) once a day. (AR 345). Plaintiff rated her neck pain as seven out of ten and described it as sharp. (AR 346). On exam, plaintiff had bilateral hand weakness, full cervical range of motion, negative Spurling's (a maneuver used to assess possible causes of neck pain), no tenderness to palpation throughout the paraspinal musculature, five out of five strength in bilateral upper extremities, and a positive Hoffmann's on the right (indicating a lesion on the spinal cord or another underlying nerve condition[5]). *Id.*

Dr. Kalantar described plaintiff's imaging and diagnostics performed during her visit[6] as showing moderate degenerative changes with osteophyte formation at C5–C6 and straightening of the normal cervical lordosis, and moderate canal stenosis deformation and "moderate severe" bilateral C5–6 neuroforaminal narrowing. *Id.* Dr. Kalantar assessed plaintiff to have cervical spondylotic myeloradiculopathy and recommended that plaintiff have a C5–C6 anterior cervical decompression and fusion given plaintiff's progressive multi-year symptoms. *Id.* Dr. Kalantar

---

[5] *What does a positive or negative Hoffman sign mean?*, https://www.medicalnewstoday.com/articles/322106 (last visited June 14, 2021) (a positive Hoffman's sign on only one side may be more likely to indicate a nervous system injury).

[6] Dr. Allison Lax's finding and interpretations of the imaging ordered by Dr. Kalantar indicated straightening of the normal cervical lordosis with minimal kyphosis at C5, and moderate intervertebral disc space narrowing and marginal osteophyte formation at C5–C6. (AR 348). Dr. Lax's impression was that plaintiff had moderate cervical spondylosis at C5–C6 with "minimal retrolisthesis of C5 with respect to C6 is slightly more pronounced on extension." *Id.*

also noted that plaintiff's cord compression was the cause of her problems and, untreated, it would worsen over time. *Id.*

      iv.    *Summary of Plaintiff's Medical History Following Her Alleged Disability Date (March 9, 2016)*

On January 12, 2017, plaintiff had an MRI of her spine after being referred by Dr. Kim because of her neck pain. (AR 330). The interpretation of that MRI revealed plaintiff had mild disc height loss at C5–C6; mild right-sided uncovertebral joint hypertrophy at C3–C4; C4–C5 mild left uncovertebral joint hypertrophy; C5–C6 disc osteophyte, complex slight thickening of the posterior ligamentum flavum causing moderate central canal stenosis and, along with uncovertebral joint hypertrophy, causing at least moderate bilateral neuroforaminal narrowing. *Id.* The impression indicated plaintiff had cervical spondylosis at C5–6 where there is moderate central canal stenosis and moderate bilateral neuroforaminal narrowing. *Id.*

On January 13, 2017, plaintiff presented to certified physician's assistant Ms. Goldshteyn, overseen by Dr. Whittenberg, at the National Spine and Pain Center in Fairfax, Virginia mainly with neck pain. (AR 319–22). Plaintiff described her neck pain as continuous, throbbing, dull, aching, shooting, stabbing, burning, and severe. (AR 319). Plaintiff's pain had begun roughly five years prior following an injury; plaintiff rated her pain that day as three out of ten, but on average as six out of ten, and sometimes ten out of ten; plaintiff also reported numbness, weakness, tingling, pins and needles, burning, and swelling. *Id.* Sitting, standing, lifting, and cold and damp weather would aggravate plaintiff's pain; while rest, avoiding strenuous activity, lying with a pillow between her legs, stretching, pain medication, and massage would all mitigate plaintiff's pain. *Id.* Plaintiff had tried oral NSAIDs, physical therapy, activity modification, and massage. *Id.*

Plaintiff reported cervical axial symptoms including difficulty closing her hands in the morning for the last couple of years. *Id.* Plaintiff also had tightness along the cervical axial spine bilaterally. *Id.* Plaintiff reported that she had worked in retail for 18 years and had deteriorating cervical axial symptoms and upper extremity symptoms with work for the previous five years. *Id.* In retail, plaintiff performed activities requiring her to have her arms lifted above her head and to bend forward for prolonged periods of time. *Id.* Plaintiff would have to take ibuprofen frequently which was "mildly efficacious" but caused plaintiff gastrointestinal issues. *Id.* Plaintiff also tried cyclobenzaprine and, intermittently, percocet for severe pain flares. *Id.* Plaintiff tried prednisone once but stated she had a reaction to it and felt her throat closing up. *Id.* After not taking prednisone (she only took it once) her symptoms resolved. *Id.* Plaintiff also tried gabapentin but she reported that it made her severely drowsy and lethargic, so she stopped. *Id.* Plaintiff tried cymbalta but it had no effect. *Id.* Plaintiff stated she attended physical therapy in 2014 without improvement but that she stretched frequently which was helpful, as were massages. *Id.* Plaintiff's symptoms worsened with prolonged upper extremity activity, quick movement of the cervical spine, and while sleeping especially if she slept on her side. *Id.* Plaintiff reported that carpal tunnel syndrome had been ruled out for her wrists and she had previously had surgery for a ganglion cyst of the right wrist. *Id.* At that time, plaintiff was prescribed cyclobenzaprine HCL, ibuprofen, oxycodone HCL, atorvastatin calcium, and omeprazole. (AR 320). Plaintiff's reported symptoms also included leg swelling, poor balance, joint swelling, and sleep disturbance. *Id.*

On examination by Ms. Goldshteyn, plaintiff had normal posture, her active and passive range of motion was normal, and her upper extremity manual motor test results were normal except for wrist extension, finger extension, and finger abduction all of which were "5-/5" on the

right and left hands. (AR 321). Plaintiff's deep tendon reflexes for upper extremities were normal, and she had normal sensation by light touch for her upper extremities except for hypoesthesia in her radial right hand and radial right-hand digits. *Id.* Plaintiff also had positive presence of taut bands of the trapezius, levator scapulae, and rhomboids. *Id.* Plaintiff was assessed to have "[m]yalgia (myofascial pain syndrome)," "other cervical disc displacement at C5–C6 level," and cervicalgia. *Id.* It was also noted that plaintiff presented with cervical axial symptoms with intermittent irritation of her peripheral nerve root sleeve of the upper extremity and that plaintiff was "appropriate" for a cervical epidural based on her symptoms and the MRI findings. (AR 322). Because plaintiff had a potential allergic reaction to prednisone after one tablet, and the epidural is steroid-based, plaintiff was referred to Dr. Nsouli for allergy testing. *Id.* If plaintiff could proceed with the epidural, trigger point injections would also be considered for myofascial tightness. *Id.*

On May 17, 2017, plaintiff reported to Dr. Nsouli for an allergy evaluation. (AR 402–04). Plaintiff reported pressure in her veins and felt a closing of her throat when she received a steroid but Dr. Nsouli found there was no evidence of objective symptoms and she was most likely not allergic to the corticosteroid. (AR 402). Instead, the symptoms appeared subjective because plaintiff did not experience objective symptoms such as uticaria or angioedema. *Id.* Dr. Nsouli advised plaintiff to call Dr. Whittenberg to have a specimen collected so that Dr. Nsouli could test plaintiff's skin for steroid allergies by exposing it to dexamethasone or methylprednisone. *Id.* Plaintiff did not follow up with Dr. Nsouli and it does not appear that she ever provided a specimen to determine if she was allergic to steroids. *Id.*

After almost two years after her initial visit, plaintiff returned to Dr. Kalantar on October 23, 2017 with persistent neck pain and radiation into bilateral arms, a sense of clumsiness in her

hands, and imbalance when ambulating. (AR 349–50). Plaintiff had "4-5" strength in her

bilateral "intrinsics" and "otherwise" five out of five strength in her bilateral upper extremities.

(AR 349). Plaintiff was positive for Hoffmann's sign on the right side and had increased pain

with cervical range of motion but was able to engage in a full range of motion. *Id.* Plaintiff

rated her pain level at ten. *Id.* Dr. Kalantar noted that an MRI had revealed moderate canal

stenosis with cord compression at C5–C6 secondary to disc osteophyte complex. *Id.* Dr.

Kalantar assessed plaintiff to have cervical arthritis with myelopathy, noting that plaintiff was

symptomatic from her cervical stenosis. *Id.* Dr. Kalantar discussed with plaintiff the likelihood

that her symptoms would worsen and that this worsening could only be halted by surgical

decompression. *Id.* Dr. Kalantar also told plaintiff that surgery might not improve her

symptoms if damage had occurred. *Id.* Dr. Kalantar recommended treatment with C5–C6

anterior cervical decompression and fusion. *Id.* Plaintiff wanted to consider her options and she

indicated she would contact Dr. Kalantar if she wanted to discuss further. *Id.*

   On January 27, 2018, plaintiff reported to Dr. Sasha Alana Thomas at the emergency

department of Alexandria Hospital with palpitations and irregular heartbeat. (AR 359–60). Her

symptoms had begun while she was vacuuming. (AR 360). Plaintiff apparently reported no

neck pain, joint pain, leg pain, or muscle pain; and her neck had a normal range of motion and

was supple. (AR 361). On February 13, 2018, plaintiff reported to Virginia Heart and on exam

it was noted that plaintiff had normal muscle strength and tone in her back and extremities. (AR

387–88). Plaintiff reported that prior to an experience of very fast heart rate for which she went

to an urgent care center and was sent to an emergency room, she had engaged in "some upper

body strenuous activity." (AR 387).

On August 13, 2018, plaintiff presented to Dr. Kim with the pain in her neck unchanged and worsening weakness of her upper extremities. (AR 417–18). Dr. Kim assessed plaintiff to have cervical degenerative disc disease/herniated nucleus pulposus with severe left radiculopathy and weakness, noting plaintiff wished to defer surgery. (AR 417). Plaintiff reported ten out of ten intermittent pain and that her pain kept her from sleeping well. *Id.* Dr. Kim noted that the opioid medications required for plaintiff's pain could cause drowsiness, and memory and judgment impairment. (AR 417–18). Plaintiff also reported frequently dropping cups and items from her hands, and that she was unable to do basic household chores, including cleaning, cooking, and laundry. (AR 418). Dr. Kim assessed that plaintiff was unable to work because of her severe pain and weakness in both upper extremities. *Id.* Dr. Kim noted that he considered plaintiff fully disabled and recommended that she not to pursue employment of any type. *Id.*

On January 15, 2019, plaintiff presented to Dr. Kim with worsening pain in her neck, weakness in both arms and hands without improvement, headaches starting from her neck and radiating to frontal areas, and poor appetite. (AR 415). On exam, Dr. Kim found plaintiff to have four out of five upper extremity strength bilaterally. *Id.* Also, on exam (except as noted above), Dr. Kim made the same findings as in the August 2018 appointment; plaintiff reported the same issues (except as noted above); Dr. Kim had the same assessments; and plaintiff continued to wish to defer surgery. *Id.* On August 1, 2019, plaintiff presented to Dr. Kim with pain at ten out of ten intermittently, weakness in both arms, and persistent headaches. (AR 413). On exam, Dr. Kim made the same findings as in the August 2018 and January 2019 appointments; plaintiff reported the same issues; Dr. Kim had the same assessments; and plaintiff continued to wish to defer surgery. *Id.*

13

Case 1:20-cv-01414-CMH-JFA   Document 25   Filed 07/08/21   Page 14 of 41 PageID# 148

*v.    Medical Source Statements and Letter from Dr. Kim*

On March 20, 2017, Dr. Kim completed a medical source statement form. (AR 333–36). Dr. Kim wrote that he saw plaintiff every two to three months because of plaintiff's worsening neck pain and worsening function of both arms. (AR 333). Dr. Kim wrote that plaintiff had progressive loss of function of both arms and "unceasing pain" in both of her arms and her neck. *Id.* Dr. Kim noted that plaintiff had cervical stenosis both central and foraminal. *Id.* Dr. Kim had diagnosed plaintiff with cervical spondylosis with stenosis, cervical radiculopathy with arm and hand numbing, and chronic pain syndrome. *Id.* Dr. Kim reported plaintiff being treated with physical therapy and cervical epidural injection but provided no other information (*e.g.* results, when the treatments occurred). *Id.* Dr. Kim's prognosis of plaintiff's health was "poor." *Id.*

Dr. Kim indicated that plaintiff could only sit for less than two hours per day and only stand or walk for less than two hours per day. *Id.* Dr. Kim indicated plaintiff did not require an ambulatory aid, and that her impairment prevented her from sitting upright for six of eight hours in a work setting. (AR 334). Dr. Kim wrote that plaintiff could sit for no more than an hour at a time but indicated her impairment did not require her to lie down during the day or elevate her legs to hip level or above. *Id.* Dr. Kim noted that plaintiff's impairment prevented her from traveling alone because she was on strong opioid pain medications. *Id.* Dr. Kim indicated that plaintiff was incapable of even low stress jobs and that plaintiff could not occasionally use her feet for pushing and pulling of leg controls. *Id.* Dr. Kim indicated that plaintiff's ability to reach in all directions, handle, finger, feel, and push or pull controls with both hands was limited to less than ten percent of an eight-hour workday; that plaintiff could only lift and carry less than five pounds occasionally during an eight-hour workday; that plaintiff could never stoop or turn her head side to side or up and down; and that plaintiff could only bend, squat and kneel for ten

14

to thirty-three percent of an eight-hour workday. (AR 335). Dr. Kim did not indicate that plaintiff experienced any side effects from medication that would interfere with daily life. *Id.* Dr. Kim reported that plaintiff's level of pain was severe, nine to ten out of ten; that plaintiff was very credible regarding her claims of pain; and that plaintiff had objective medical reasons for pain, citing multiple MRIs. (AR 336). Dr. Kim concluded that plaintiff's disability was not likely to change; plaintiff would be absent from work due to her impairment more than three times a month; plaintiff would require additional rest periods beyond two 15 minute breaks and one 30 minute break during an eight-hour work shift, and that plaintiff would need 15 to 20 minutes of rest every hour. (AR 336).

On September 17, 2018, Dr. Kim wrote a letter stating that plaintiff had been under his care since April 2012; that she had been diagnosed with degenerative disc disease of the cervical spine with right arm and neck pain that caused weakness in her right arm; and that she had severe daily pain requiring opioid pain management. (AR 406). Dr. Kim also noted plaintiff was a surgical candidate but wished to defer surgery. *Id.* Dr. Kim wrote that plaintiff had been unable to work for the past several years and that her pain and functional limitations requiring pain management rendered her fully disabled. *Id.*

On August 3, 2019, Dr. Kim completed another medical source statement form. (AR 408–11). Dr. Kim wrote that he saw plaintiff every three to four months because of plaintiff's severe neck pain and loss of strength, sensation, and function of both arms. (AR 408). Dr. Kim noted that plaintiff had an MRI of the cervical spine that showed severe canal stenosis, arthritis, and disc disease. *Id.* Dr. Kim also wrote that plaintiff had polyarthritis of both hands and the lower back. *Id.* Dr. Kim had diagnosed plaintiff with severe cervical spinal stenosis, chronic pain, cervical radiculopathy, and bilateral upper extremity weakness and numbness. *Id.* Dr. Kim

15

indicated plaintiff's treatment included pain medications, epidural injections, and rest, and noted that surgery had been recommended. *Id.* Dr. Kim's prognosis was that plaintiff's health would worsen. *Id.* Dr. Kim indicated that plaintiff could only sit for less than two hours per day and only stand or walk for less than two hours per day. *Id.* Dr. Kim indicated plaintiff did not require an ambulatory aid and that her impairment prevented her from sitting upright for six of eight hours in a work setting. (AR 409). Dr. Kim wrote that plaintiff could sit for no more than an hour at a time without a long break but indicated that plaintiff's impairment did not require her to lie down during the day and did not require her to elevate her legs to hip level or above. *Id.* Dr. Kim noted that plaintiff could not travel alone because of drowsiness from opioid pain medications and arm weakness. *Id.* Dr. Kim indicated that plaintiff was incapable of low stress jobs and could not occasionally use her feet for pushing and pulling of leg controls. *Id.*

Dr. Kim indicated that plaintiff's ability to reach in all directions, handle, finger, feel, and push or pull controls with both hands was limited to less than ten percent of an eight-hour workday; that plaintiff could only lift and carry less than five pounds occasionally during an eight-hour workday; that plaintiff could never stoop or turn her head side to side or up and down; and that plaintiff could only bend, squat and kneel for ten to thirty-three percent of an eight-hour workday. (AR 410). Dr. Kim wrote that plaintiff experienced drowsiness from her pain medication that interfered with her daily life. *Id.* Dr. Kim wrote that plaintiff's level of pain was severe, nine to ten out of ten intermittently; that plaintiff was very credible regarding her claims of pain; and that plaintiff had objective medical reasons for pain, citing multiple MRIs. (AR 411). Dr. Kim concluded that plaintiff's disability was not likely to change; plaintiff would be absent from work due to her impairment more than three times a month; and plaintiff would require additional rest periods beyond two 15-minute breaks and one 30-minute break during an

16

eight-hour work shift.  *Id.*  Dr. Kim wrote that plaintiff would need 15 to 30 minutes of rest every hour.  *Id.*

## C.     The ALJ's Decision on January 16, 2020

The ALJ concluded that plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act from March 9, 2016 through the date of the decision.  (AR 23–24).  In determining whether an individual is eligible for DIB, the ALJ is required to follow a five-step sequential evaluation process.  It is this process the court examines to determine whether the correct legal standards were applied and whether the ALJ's final decision is supported by substantial evidence in the record.  *See* 20 C.F.R. § 404.1520.

Specifically, the ALJ must consider whether a claimant: (1) is currently engaged in substantial gainful employment; (2) has a severe impairment; (3) has an impairment that is medically equivalent to any of the information listed in Appendix 1, Subpart P of the regulations considered *per se* disability; (4) has the ability to perform past relevant work; and (5) if unable to return to past relevant work, whether the claimant can perform other work that exists in significant numbers in the national economy.  *See* 20 C.F.R. §§ 404.1520(a)(4), 404.1560.  The claimant bears the burden to prove disability for the first four steps of the analysis.  *See* 20 C.F.R. § 404.1560.  The burden then shifts to the Commissioner at step five.  20 C.F.R. § 404.1560(c).  When considering a claim for DIB, the ALJ must also determine whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met.  *See* 42 U.S.C. §§ 416(i), 423.  The regulations promulgated by the Social Security Administration provide that all relevant evidence will be considered in determining whether a claimant has a disability.  *See* 20 C.F.R. § 404.1545(a)(3).

17

Here, the ALJ made the following findings of fact:

(1) The claimant meets the insured status requirements of the Social Security Act through March 31, 2021.

(2) The claimant has not engaged in substantial gainful activity since March 9, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

(3) The claimant has the following severe impairments: cervical degenerative disc disease/spondylosis with C5–6 disc protrusion causing moderate central canal stenosis and cervical myeloradiculopathy (20 CFR 404.1520(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

(5) [T]he claimant has the residual functional capacity to perform light work (20 CFR 404.1567(b)) defined as lifting/carrying twenty pounds occasionally and ten pounds frequently. In an eight-hour day, she can sit six hours and stand and/or walk six hours. She can never climb ladders, ropes, or scaffold. She can only occasionally climb ramps and stairs, stoop, crouch, kneel, crawl, and balance. She can frequently push or pull with her bilateral extremities. She can frequently handle, finger, and feel with her bilateral upper extremities. She can occasionally rotate her neck to the right but she can frequently rotate her neck to the left, extend, and flex her neck. She can have occasional exposure to extreme cold, wetness, humidity, and extreme heat. She can have occasional exposure to vibration and hazards, including unprotected heights and exposed moving mechanical parts.

(6) The claimant is capable of performing past relevant work as a sales clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

(7) The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2016, through the date of this decision (20 CFR 404.1520(f)).

(AR 12–23).

The Appeals Council declined to review the ALJ's decision finding no reason to do so under its rules. (AR 1–3).

## IV.  ANALYSIS

### A.  Plaintiff's Argument

Plaintiff argues that the ALJ's reasons for according less than controlling weight to Dr. Kim's opinions in assessing plaintiff's residual functional capacity are not supported by substantial evidence.  (Docket no. 18 at 6–11).  Plaintiff notes that a treating source's medical opinion regarding the nature and severity of a claimant's condition is entitled to controlling weight if the opinion is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record. (Docket no. 18 at 6) (citing 20 C.F.R. § 404.1527(c)(2)).  Plaintiff further notes that even if a treating source opinion is not entitled to controlling weight, "it is still entitled to deference and should be weighed according to the enumerated factors set out in 20 C.F.R. § 404.1527(c); SSR 96-2p." *Id.*

Plaintiff argues, contrary to the ALJ's finding, that Dr. Kim's treatment notes are consistent with his medical opinions. *Id.* at 7–8.  Plaintiff asserts Dr. Kim repeatedly documented concerns regarding plaintiff's ability to lift or carry heavy items and consistently reported that plaintiff should not lift more than ten pounds at a time. *Id.* at 8.  Plaintiff also asserts that Dr. Kim's treatment notes documented weakness in plaintiff's arms, hands, and shoulders and that plaintiff had extreme right leg pain. *Id.*  Plaintiff contends that Dr. Kim was aware of medical imaging that revealed cervical spondylosis and, at C5–C6, moderate central canal stenosis and moderate neuroforaminal narrowing bilaterally. *Id.*  Plaintiff cites Dr. Kim's notes indicating he had diagnosed plaintiff with cervical degenerative disc disease with severe left radiculopathy and weakness. *Id.*  Plaintiff also asserts that Dr. Kim found that plaintiff required opioid medication for pain management which could have side effects including drowsiness and memory and judgment impairments. *Id.*  Plaintiff further references Dr. Kim's

19

treatment notes suggesting plaintiff dropped cups and other items frequently, was unable to do basic household chores, and was unable to work due to severe pain and weakness in both upper extremities. *Id.*

Plaintiff contends that these notes also establish that Dr. Kim did more than merely check boxes, contrary to the ALJ's assertion. *Id.* at 8–9. Plaintiff argues the ALJ was obligated to consider the entire record in evaluating Dr. Kim's determinations in the medical source statement forms. *Id.* at 9. Plaintiff asserts Dr. Kim explained that he had a longstanding treatment history with plaintiff going back to June 2013 and that Dr. Kim documented plaintiff having suffered worsening neck pain and decreased functioning in both of her arms. *Id.* at 6, 10. Plaintiff contends this evidence supported Dr. Kim's opinions limiting plaintiff's ability to lift or carry or use her upper extremities. *Id.* at 9. Dr. Kim also wrote that plaintiff could not travel alone because of her opioid medications and that she could not stand or sit upright for too long because of her severe neck and arm pain. *Id.* at 10. Plaintiff contends these statements also support Dr. Kim's opinions, but the ALJ "overlooked" them. *Id.*

Plaintiff argues the ALJ's "accusation" that Dr. Kim relied heavily on plaintiff's subjective complaints was baseless as the ALJ provided no evidence to support that "accusation." *Id.* Plaintiff asserts Dr. Kim found her very credible and that he had access to multiple MRIs that he relied on as objective evidence to support his conclusions. *Id.* Plaintiff contends Dr Kim was a treating source; that his treatment notes, assessments, and letter were all consistent; and that his assessments and opinions were consistent with plaintiff's claimed impairments. *Id.* at 11.

Plaintiff notes that Dr. Kim completed another medical source statement form on August 3, 2019 reporting the same opinions as in the March 20, 2017 medical source statement form. *Id.*

at 9. Plaintiff asserts the ALJ should have given Dr. Kim's opinions greater weight given that the two opinions, separated by significant lengths of time, support each other, but the ALJ gave Dr. Kim's second opinion the same weight as the first opinion for the same reasons. *Id.* Plaintiff cites Dr. Kim's letter, written on September 17, 2018, as providing additional support and explanation for his determinations because Dr. Kim wrote that plaintiff had been diagnosed with degenerative disc disease of the cervical spine with right arm and spine pain that required opioid management, and that plaintiff had been unable to work for the past several years because of her pain and functional limitations from her pain medication. *Id.* at 9–10. [7]

---

[7] Plaintiff filed a reply that restates her arguments discussed in this section and rejects the Commissioner's arguments, which are summarized in the next section, as attempting to provide analysis the ALJ failed to provide. (Docket no. 24 at 1–5). As discussed below in Sections D and E, the ALJ thoroughly explained her reasons for giving Dr. Kim's opinions very little weight and those reasons are supported by substantial evidence. Furthermore, the Commissioner's pleadings do not provide analysis the ALJ failed to provide, but instead cite caselaw that supports the validity and soundness of the ALJ's analysis. Plaintiff challenges two specific arguments as *post hoc* rationalizations: 1) the Commissioner's argument that plaintiff made an "invalid" argument regarding Dr. Kim's opinions and notes regarding the limitations that could result from the side effects of plaintiff's opioid medications; and 2) the Commissioner's argument that an MRI result does not necessarily equate to a functional limitation. *Id.* at 4–5. The Commissioner's arguments are not *post hoc* rationalizations. The ALJ explained why the information Dr. Kim referenced in his medical opinions would not support all the extreme limitations he indicated, as discussed in subsection IV.E.*ii*, and plaintiff mischaracterizes Dr. Kim's opinions regarding any impairments actually caused by the side effects of plaintiff's opioid medications, as discussed in subsection IV.E.*iv*. Plaintiff asserts the "ALJ did not analyze the medical record for the opioid pain management or MRI." *Id.* at 4. A review of the ALJ's decision reveals that she clearly analyzed the record regarding the MRIs, as discussed in subsection IV.E.*ii*, and there was no reason for the ALJ to further analyze the record regarding plaintiff's opioid pain management because the side effects Dr. Kim identified could not possibly have caused the extreme limitations he indicated, as discussed in subsection IV.E.*iv*. To the extent plaintiff argues the ALJ failed to address the extreme side effects plaintiff asserts Dr. Kim indicated were caused by plaintiff's opioid medications, plaintiff's argument is invalid. Plaintiff mischaracterizes the impairments Dr. Kim indicated were caused by the side effects of plaintiff's opioid medication, as discussed in subsection IV.E.*iv*. The ALJ did address medication side effects in her residual functional capacity analysis (AR 20) but she could not be required to discuss impairments that Dr. Kim never actually indicated existed as a result of plaintiff's limited use of opioid medications.

**B.     The Commissioner's Argument**

The Commissioner asserts the ALJ's reasons for giving only little weight to Dr. Kim's opinions are supported by substantial evidence. (Docket no. 21 at 14–23). The Commissioner contends that the review of the weight the ALJ assigns to medical opinions is particularly deferential, citing established Fourth Circuit and Eastern District of Virginia cases. *Id.* at 14. After detailing the ALJ's analysis and assessment of Dr. Kim's opinions, and asserting substantial evidence supports the ALJ's analysis and assessment, the Commissioner addressed plaintiff's specific arguments. *Id.* at 15–23. The Commissioner asserts plaintiff's references to Dr. Kim's treatment notes are, in fact, references to plaintiff's subjective complaints recorded in Dr. Kim's treatment notes. *Id.* at 19. Again, the Commissioner cited relevant caselaw to contend that an ALJ is not required to accept subjective assertions of disabling pain, nor medical opinions that adopt those assertions without making objective findings. *Id.* at 19–20. Regarding plaintiff's contention that Dr. Kim found plaintiff required opioid pain management *causing* drowsiness and memory and judgment impairments, the Commissioner asserts Dr. Kim was again merely incorporating plaintiff's subjective assertions of pain and then listing *possible* side effects of plaintiff's medications. *Id.* at 20. The Commissioner contends this is not an objective medical finding that plaintiff *actually suffered* from impaired memory and judgment as a result of her opioid pain management medication. *Id.* at 20–21.

The Commissioner argues that plaintiff has failed establish that the ALJ's determination is unsupported by substantial evidence. *Id.* at 21. The Commissioner counters plaintiff's assertion that Dr. Kim did not just check boxes but diagnosed plaintiff with impairments and treated her over a number of years by citing Fourth Circuit and Eastern District of Virginia caselaw establishing that diagnoses are not functional impairments, and notes that the ALJ

22

explicitly considered Dr. Kim's treating relationship but concluded that his opinions regarding the severity of plaintiff's limitations were not supported by the record. *Id.* The Commissioner rejects plaintiff's assertion that Dr. Kim's multiple opinions somehow enhance their accuracy or credibility, noting the ALJ found they all suffered from similar flaws. *Id.* at 20–21. The Commissioner also rejects plaintiff's heavy reliance on her MRI findings. *Id.* at 22. Citing an Eastern District of Virginia case and a District of South Carolina case, the Commissioner contends MRI results do not equate to functional impairments or limitations. *Id.* Noting the ALJ's consideration of other evidence in the record, the Commissioner contends substantial evidence supported the ALJ's rejection of Dr. Kim's apparent extreme interpretation of plaintiff's MRI results in his limitations of her activites. *Id.*

C.     **The Residual Functional Capacity Analysis and Treating Source Opinions**

If the ALJ finds a claimant's impairments do not meet the requirements of the listed impairments in Appendix 1 at step three (3) of the sequential analysis, then the ALJ must determine the claimant's residual functional capacity. 20 C.F.R. § 404.1520(e). Residual functional capacity is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). It is based "on all the relevant medical and other evidence" in the case record. 20 C.F.R. § 404.1545(a)(3). The residual functional capacity determination incorporates both objective medical evidence and a claimant's subjective statements, whether those statements are based on formal medical examinations or not. *Id.* In assessing a claimant's residual functional capacity, the ALJ considers the claimant's "ability to meet the physical, mental, sensory, and other requirements of work." 20 C.F.R. § 404.1545(a)(4).

The ALJ must consider all medical opinions. 20 C.F.R. § 404.1527(c). If the medical opinions are internally inconsistent, or inconsistent with each other or other evidence in the

record, the ALJ is required to evaluate the opinions and assign them respective weight. *See* 20

C.F.R. § 404.1527(c)(2)-(6); *Tanner v. Comm'r of Soc. Sec.*, 602 F. App'x 95, 100 (4th Cir.

2015) ("An ALJ is required to assign weight to every medical opinion in a claimant's record.")

(citing 20 C.F.R. § 404.1527(c))). The ALJ must "explicitly indicate[] the weight given to all the

relevant evidence" for the reviewing court to determine if the ALJ's findings are supported by

substantial evidence. *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citing *Myers v.*

*Califano*, 611 F.2d 980, 983 (4th Cir. 1980)); *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir.

1979); *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977)).

Generally, the court should not disturb an ALJ's decision as to the weight afforded a medical

opinion absent some indication that the ALJ "dredged up 'specious inconsistencies.'" *Dunn v.*

*Colvin*, 607 F. App'x 264, 267 (4th Cir. 2015) (quoting *Scivally v. Sullivan*, 966 F.2d 1070, 1077

(7th Cir. 1992)). If the ALJ fails to "sufficiently explain[] the weight [s]he has given to

obviously probative exhibits, to say that h[er] decision is supported by substantial evidence

approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine

whether the conclusions reached are rational.'" *Arnold*, 567 F.2d at 259 (quoting *Oppenheim v.*

*Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Generally, the ALJ "give[s] more weight to the medical opinion of a source who has

examined [the claimant] than to the medical opinion of a medical source who has not examined

[the claimant]." 20 C.F.R. § 404.1527(c)(1). Treating sources are medical sources who provided

treatment and/or evaluation and had an ongoing treatment relationship with the claimant. 20

C.F.R. § 404.1527(a)(2). In deciding the weight to give a medical opinion, an ALJ will consider

(1) the examining relationship; (2) the treatment relationship; (3) supportability; (4) consistency;

(5) specialization; and (6) other factors. 20 C.F.R. § 404.1527(c)(1)–(6). If a treating source's

medical opinion on the nature and severity of the claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.[8]  20 C.F.R. § 404.1527(c)(2).  If a treating source's medical opinion is not given controlling weight, the factors listed above are used to determine the weight to give the medical opinion.  *Id.*  The ALJ must provide "good reasons" for the weight given to the treating source's medical opinion.  *Id.*

### D.   The ALJ's Explanation for Giving Dr. Kim's Opinions Very Little Weight

After a thorough review of the medical evidence (AR 17–19), the ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, but that plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record (AR 19).  The ALJ assessed that the type of treatment plaintiff had sought over the past few years supported a finding that plaintiff was not as disabled as she alleged.  *Id.* The ALJ noted that plaintiff only had intermittent visits with her primary care physician for medication management and had not sought surgery or even other conservative measures (*e.g.* physical therapy, pain management, and injections) since the alleged onset date.[9]  *Id.*  Given plaintiff's symptoms related to her cervical degenerative disc disease at C5–6, the ALJ found plaintiff was limited to light work with several additional postural limitations, including only frequent pushing or pulling with bilateral upper extremities, and frequent handling, fingering,

---

[8] Plaintiff cites SSR 96-2p as providing guidance when a medical opinion is not given controlling weight.  (Docket no. 18 at 6).  SSR 96-2p defines substantial evidence as already defined above and provides little other guidance relevant to this case.

[9] While Dr. Kim's medical source statements seem to indicate that plaintiff has received epidural injections (AR 333, 408), there are no medical records indicating that she ever followed through with receiving those treatments (AR 319–22).

and feeling. *Id.* The ALJ limited plaintiff's pushing and pulling with bilateral upper extremities based on her cervical myeloradiculopathy with reduced four out of five strength. *Id.* The ALJ did not further limit plaintiff's handling, fingering, or feeling because she had sought no treatment other than medications and there was no evidence of reduced grip or pinch strength except for one exam noting mildly reduced strength at "5-/5" in the left wrist, bilateral finger extensions, and bilateral finger abductions and "4-/5" strength in her bilateral intrinsic muscles. *Id.* The ALJ noted that an exam mentioned hypoesthesia in the right hand, and another noted "poor fine motor movements bilaterally," but the ALJ countered that no extensive testing of plaintiff's hands was conducted. *Id.*

The ALJ found plaintiff was limited to occasionally rotating her neck to the right, frequently rotating her neck to the left, frequently extending her neck, and frequently flexing her neck because exams indicated plaintiff had a full range of motion in her cervical spine with no tenderness to palpation. *Id.* Given her symptoms and medication side effects, she was limited to occasional exposure to extreme cold, wetness, heat, vibration, and hazards. (AR 19–20). The ALJ found plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms inconsistent because the medical record contained "no objective evidence to support further restrictions" and stated that plaintiff's subjective complaints alone were insufficient. (AR 20). The ALJ noted that plaintiff's physical exams were unremarkable except for occasional, reduced strength at four out of five in her bilateral upper extremities (with other reports being five out of five); vague mentions of bilateral hand weakness in a 2015 orthopedic exam; and an October 2017 orthopedic exam finding some reduced strength in her wrist and hand muscles. *Id.* The ALJ noted that "a couple" exams found positive Hoffman's sign on the right and one exam noted hypoesthesia in the right radial hand and digits, but that sensation was otherwise intact. *Id.*

26

The ALJ noted that the records showed that plaintiff had full cervical range of motion despite these limited findings; that Spurling's testing was negative; that there was no tenderness to palpation throughout the cervical paraspinal musculature; that although there was tightness in her upper back and shoulder muscles, plaintiff's shoulders had full range of motion and there was no tenderness to palpation; that plaintiff had no abnormalities in her bilateral lower extremities or back; and that plaintiff had a normal gait. *Id.* Based on this evidence, the ALJ found the "medical evidence of record simply d[id] not support the severity of limitation alleged by [plaintiff]." *Id.*

The ALJ also noted that Dr. Kim provided no explanation in the forms for checking the box that plaintiff's condition prevented her from sitting upright for six of eight hours in a work setting except for noting plaintiff's reported severe neck and arm pain. (AR 20). The ALJ also noted that Dr. Kim provided no explanation for indicating that plaintiff was incapable of even low stress jobs. *Id.* The ALJ described how Dr. Kim found plaintiff could not sit for more than an hour at a time but did not find that plaintiff had to lie down during the day. *Id.* The ALJ discussed how Dr. Kim indicated plaintiff could not use her feet occasionally for pushing and pulling of leg controls "despite the record not supporting any problems with [plaintiff's] bilateral lower extremities or back." *Id.* The ALJ detailed Dr. Kim's March 2017 statement and noted that Dr. Kim's August 2019 statement had similar findings. *Id.* at 20–21. Regarding the August 2019 statement, the ALJ described how Dr. Kim alleged plaintiff had polyarthritis in her hands despite Dr. Kim's treatment notes revealing no evidence of polyarthritis in plaintiff's hands and no lab work or x-rays confirming arthritis in her hands. (AR 21).

The ALJ then explained why she gave Dr. Kim's opinions very little weight:

The opinions in these forms from Dr. Kim are given very little weight as they are extreme in light of Dr. Kim's own treatment notes and the medical evidence of

27

record as a whole including her only treatment as medications. The only consistent objective finding in Dr. Kim's treatment notes was his mention of 4/5 strength in the bilateral upper extremities, which would not support all the extreme limitations provided by Dr. Kim. Dr. Kim merely checked off boxes on a form and did not provide a narrative report containing specific clinical findings to support all the extreme limitations. He apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Yet as noted above, despite her extreme allegations of pain, weakness, and numbness she has not sought treatment except medication. He did not order further testing such as rheumatologic lab work, x-rays, or EMG testing. Dr. Kim's opinions are without substantial support from the other evidence of record, which renders it less persuasive.

*Id.*

### E.    The ALJ's Decision to Give Very Little Weight to Dr. Kim's Opinions Is Supported by Substantial Evidence

The first subsection below details the ALJ's appropriate consideration of the factors used to determine the weight to give a medical opinion. The following subsections address plaintiff's specific arguments, which challenge the ALJ's reasons for giving Dr. Kim's opinions very little weight. To some extent, plaintiff's arguments turn on whether the ALJ accurately characterized Dr. Kim's opinions. Whether the ALJ's reasons are supported by substantial evidence therefore depends on whether a reasonable person could conclude that the ALJ's decision accurately describe Dr. Kim's opinions. *See Mastro v. Apfel*, 270 F.3d at 176. The analysis following the first subsection establishes that a reasonable person could conclude that the ALJ accurately described Dr. Kim's opinions in her reasons for giving his opinions very little weight. Accordingly, because a reasonable person could conclude that the ALJ accurately characterized Dr. Kim's opinions, and the ALJ appropriately considered the relevant factors in determining the weight to give Dr. Kim's opinions based on the entire record, substantial evidence supports the ALJ's decision to give very little weight to Dr. Kim's opinions.

28

> i.    *The ALJ Appropriately Considered the Relevant Factors Listed in the*
> *Applicable Regulation to Determine the Weight to Give Dr. Kim's Medical*
> *Opinions*

The ALJ found Dr. Kim's opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques and were inconsistent with substantial evidence in the record. (AR 20–21). Therefore, the ALJ did not give Dr. Kim's opinions controlling weight even though he was a treating source.[10] *See* 20 C.F.R. § 404.1527(c)(2). The ALJ found that the clinical and laboratory diagnostic findings did not support the extreme limitations indicated by Dr. Kim and that those findings were inconsistent with Dr. Kim's opinions, including regarding plaintiff's ability to handle, finger, and feel; use her feet and legs; handle work stress; turn her head; and lift weight, among other things. (AR 20–21). When a medical opinion is not entitled to controlling weight, the ALJ must use the following factors to determine how much weight to give the medical opinion: (1) the examining relationship; (2) the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. 20 C.F.R. § 404.1527(c)(1)-(6).

The ALJ found that Dr. Kim's opinions of plaintiff's limitations were not well-supported and were not consistent with Dr. Kim's treatment notes and the other medical evidence. (AR 21). Dr. Kim found plaintiff had four out of five upper extremity strength on exam, a somewhat modest limitation. (AR 324–27, 413, 415). Dr. Kalantar found 5 out of 5 strength in bilateral upper extremities in 2015 (AR 346) and "4-5" strength in "bilateral intrinsics" and otherwise 5 out of 5 strength in bilateral upper extremities in 2017 (AR 349–50). Dr. Kalantar and Ms. Goldshteyn and Dr. Whittenberg similarly only found mild weakness and limitations regarding

---

[10] Dr. Kim qualifies as a treating source because he provided plaintiff with medical treatment and evaluation and had an ongoing treatment relationship with plaintiff. *See* 20 C.F.R. § 404.1527(a)(2).

plaintiff's hands.  (AR 319–22, 345–46).  The ALJ assessed that plaintiff's treatment with only pain medication rather than epidural injections, physical therapy, pain management, and surgery also indicated that her limitations were not as severe as she claimed, and as Dr. Kim opined.[11] (AR 19–21).  These medical records establish that a reasonable person could conclude that Dr. Kim's opinions were not well-supported and not consistent with the other medical evidence. Therefore, substantial evidence supports the ALJ's findings that Dr. Kim's opinions were not well-supported and were not consistent with his treatment notes and the other medical evidence.

The ALJ considered Dr. Kim's specialization and his examining relationship and treatment relationship with plaintiff.  The ALJ gave Dr. Kim's opinions regarding plaintiff's lifting ability some weight, in part because he had been her primary care physician (examining relationship).  (AR 21).  The ALJ noted that plaintiff's only treatment over the last few years had been visits with her primary care physician, Dr. Kim, for medication management (treatment relationship).  (AR 19).  The ALJ also noted that Dr. Kim is an internist and that plaintiff has been seen by other specialists for her cervical spine issues and pain.  (AR 16–18, 20).  The ALJ therefore considered Dr. Kim's specialization, which is unrelated to plaintiff's cervical spine issues.

After consideration of all these factors, particularly the factors of supportability and consistency, the ALJ gave most of Dr. Kim's opinions very little weight.[12]  (AR 21).  Dr. Kim's multiple opinions do not enhance their supportability or consistency because they all suffer from the same flaws of lack of supportability and consistency with the evidence in the record, as

---

[11] The nature of the treatment is relevant.  *See, e.g., Dunn v. Colvin*, 607 F. App'x at 271–72.

[12] The ALJ also gave no weight to Dr. Kim's statements that plaintiff was disabled and unable to work because those issues are reserved for the Commissioner.  (AR 21–22); *see* 20 C.F.R. 404.1527(d).

described by the ALJ. (AR 20–22). As discussed in more detail below, the ALJ provided good reasons for giving most of Dr. Kim's opinions very little weight and the ALJ's reasons are supported by substantial evidence.

> ii. *Substantial Evidence Supports the Finding that Dr. Kim Failed to Provide a Narrative Report to Support all of the Limitations in his Statement*

Contrary to plaintiff's argument, the ALJ did not assert that Dr. Kim merely checked boxes to indicate plaintiff's disability. The ALJ found that Dr. Kim "merely checked off boxes on a form and did not provide a narrative report containing specific clinical findings to support *all* of the extreme limitations." (AR 21) (emphasis added). In other words, the ALJ only asserted that Dr. Kim did not provide a narrative report containing specific clinical findings to support *all* of the limitations indicated in the boxes checked. *Id.*

The record shows that Dr. Kim often did no more than check boxes indicating plaintiff's limitations. Dr. Kim did not provide a narrative report, clinical findings, or any explanation whatsoever regarding his indication (by check-marking a blank box) that plaintiff was incapable of even low-stress jobs. (AR 334, 409). Dr. Kim also indicated (by check-marking a blank box) that plaintiff could not sit upright for six of eight hours in a work setting. *Id.* Dr. Kim's only written basis for this assertion was that plaintiff had severe neck and arm pain and chronic pain syndrome. *Id.* That is not a narrative report regarding the extent of plaintiff's limitation, nor does it reference any specific clinical findings. Dr. Kim indicated (by check-marking two blank boxes) that plaintiff could not occasionally use her feet to push or pull leg controls. *Id.* Dr. Kim did not provide a narrative explanation for this limitation regarding plaintiff's use of her feet, nor did he relay any specific clinical findings to support that limitation. *Id.*

Vague, general sentence fragments in Dr. Kim's opinions are not narratives explaining Dr. Kim's extreme limitations. Dr. Kim "checked off boxes" indicating plaintiff could use her

bilateral upper extremities only ten percent of the time, at most, to reach in all directions and overhead, to handle, finger, and feel, and to push and pull controls. (AR 335, 410). Dr. Kim also checked boxes indicating plaintiff could never stoop, never turn her head to side to side or up and down, and could only occasionally bend, squat, and kneel. *Id.* Dr. Kim did not associate any narrative explanations or specific clinical findings with these functional limitations. *Id.* Dr. Kim only mentioned, at the beginning of the forms, worsening neck and arm pain, worsening function, progressive loss of functioning of both arms, and bilateral upper extremity loss of sensation and strength and numbness. (AR 333, 408). Dr. Kim did not connect these assertions to any specific limitations, nor would doing so supply narratives explaining Dr. Kim's limitations with clinical findings. Dr. Kim only referenced the clinical findings of central and foraminal cervical stenosis at the beginning of the forms without connection to any specific limitation. *Id.* A mere assertion of an MRI result is not a narrative explaining a limitation. *See, e.g.*, *Williams v. Berryhill*, 2018 WL 851259, at \*10 n.4 (E.D. Va. Jan. 18, 2018). In the August 2019 medical source statement, Dr. Kim wrote that plaintiff had polyarthritis of both hands but referenced only an MRI of her cervical spine. (AR 408). A mere assertion of a diagnosis is not a narrative report nor a clinical finding that would support any limitations. On September 17, 2018, Dr. Kim stated that plaintiff had been diagnosed with degenerative disc disease of the cervical spine with right arm and neck pain that caused weakness in her right arm, and that plaintiff had severe daily pain requiring opioid pain management. (AR 406). Again, Dr. Kim failed to provide a narrative report that explained any specific functional limitations based on the degenerative disc disease of the cervical spine diagnosis. *Id.*

Even considering the MRI results in combination with the assertions of worsening neck and arm pain, worsening function, progressive loss of functioning in both arms, and bilateral

32

upper extremity loss of sensation, strength, and numbness does not provide a narrative report explaining any specific functional limitation, nor would it constitute a reference to a clinical finding regarding a specific limitation. Even if that combination did constitute a narrative report referencing a clinical finding, it still would not explain how plaintiff was so extremely limited regarding any of the specific limitations Dr. Kim indicated.

Dr. Kim provided explanations for only two of the functional limitations he indicated. "[S]evere arm and neck pain," and "chronic pain syndrome" were mentioned only in connection with the limitation of inability to stand or sit upright for six of eight hours. (AR 334, 409). "Drowsiness from opioid medications" and "arm weakness" were explanations only for plaintiff's impairment preventing her from traveling alone. (AR 334, 409). Dr. Kim's only objective references for plaintiff's pain were plaintiff's "multiple MRIs." (AR 336). But the record only contains MRIs of plaintiff's cervical spine. (AR 309–10, 320–21, 330, 337–38, 346, 348–49). In his August 2019 medical source statement (written on the same form as his March 2017 medical source statement), Dr. Kim added that clinical findings, medical test results, and/or laboratory results had found that plaintiff had arthritis and disc disease and polyarthritis of the lower back. (AR 408). But no actual lab results, clinical findings, or medical test results are referenced by Dr. Kim except "MRI of Cervical Spine." *Id.* The cervical spine comprises the vertebrae of the neck. Furthermore, none of Dr. Kim's treatment notes indicate any lower back issues. (AR 323–29, 413–19). Nothing in Dr. Kim's medical opinions, even not specifically associated with the various limitations indicated, constitutes a narrative report explaining plaintiff's alleged extreme limitations.

References to Dr. Kim's treatment notes also fail to supply missing narratives explaining the extreme limitations Dr. Kim opined. None of Dr. Kim's treatment notes explain how

33

plaintiff would be "incapable of even of low stress jobs." (AR 323–29, 413–19). Dr. Kim also did not provide in his treatment notes any narrative explanation or clinical findings regarding why plaintiff would *never* be able to stoop or turn her head side to side or up and down. *Id.* Nor why plaintiff could only occasionally bend, squat, and kneel. *Id.* Nor why plaintiff could only reach in all directions, handle, finger, feel, and push and pull controls with her bilateral upper extremities only ten percent of the time at most. *Id.* Nor why plaintiff could not sit upright for six of eight hours in a work setting. *Id.* Nor why plaintiff could not occasionally use her feet to push or pull leg controls.[13] *Id.* The ALJ acknowledged Dr. Kim's consistent finding that plaintiff had four out of five strength in her bilateral upper extremities, but found that the impairment of four out of five strength would not support all the extreme limitations indicated by Dr. Kim. (AR 21).

Dr. Kim failed to provide narrative reports that referenced clinical findings to explain all of the extreme limitations he indicated. Therefore, a reasonable person could conclude that Dr. Kim "merely checked off boxes on a form and did not provide a narrative report containing specific clinical findings to support all of the extreme limitations." (AR 21). Accordingly, the ALJ's assertion that Dr. Kim "merely checked off boxes" and failed to provide a narrative report to support all of this limitations is supported by substantial evidence.

---

[13] There is a single notation of ten out of ten right leg and/or foot pain in treatment notes from a November 15, 2016 appointment. (AR 327). That does not constitute a specific clinical finding or narrative report sufficient to establish that plaintiff has limitations regarding her legs or feet. Nor does plaintiff's subjective report of leg swelling and poor balance at her appointment with Ms. Goldshteyn in January 2017. (AR 319–22). Nor does plaintiff's subjective report of "imbalance when ambulating" to Dr. Kalantar in October 2017. (AR 349–50). Furthermore, the ten out of ten right leg and/or foot pain occurred in the context of an apparent urinary tract infection. (AR 327).

> iii.   *The ALJ's Assertion that Dr. Kim Appeared to Rely Heavily on and*
> *Uncritically Accept Plaintiff's Subjective Reports of her Symptoms Is*
> *Supported by Substantial Evidence*

The ALJ wrote that Dr. Kim "apparently relied quite heavily on the subjective report of

symptoms and limitations provided by [plaintiff], and seemed to uncritically accept as true most,

if not all, of what [plaintiff] reported." (AR 21). The ALJ then noted that "despite [plaintiff's]

extreme allegations of pain, weakness, and numbness, she has not sought treatment except

medication. . . [and Dr. Kim] did not order further testing such as rheumatologic lab work, x-

rays, or EMG testing." *Id.* Plaintiff did not seek physical therapy, pain management, or epidural

injections (even though she appears not to have been allergic). (AR 19, 21, 402, 413–18). Nor

did plaintiff seek surgery for her cervical spine issues despite being recommended to do so by

Dr. Kalantar and Dr. Kim. (AR 19, 345–46, 349–50, 406, 408, 413, 415, 417).

Dr. Kim must have been relying on plaintiff's reports regarding her handling, fingering,

and feeling limitations. Dr. Kim did not do extensive physical exams or any other diagnostic

techniques that would have established an objective basis for plaintiff's reported limitations.

(AR 323–29, 413–19). The ALJ did not limit plaintiff's handling, fingering, and feeling because

there was no evidence (other than plaintiff's subjective reports of dropping things) of reduced

grip or pinch strength except one exam noting mildly reduced strength at "5-/5" in the bilateral

wrist extensions, bilateral finger extensions, and bilateral finger abductions, and "4-/5" strength

in her bilateral intrinsic muscles. (AR 19, 321, 349). Although one exam mentioned

hypoesthesia in the right hand, another vaguely noted bilateral hand weakness, and another noted

poor fine motor movements bilaterally, no extensive testing was done on physical exam or

diagnostic technique to determine the extent of the limitation or the cause. (AR 19, 320–22,

345–46, 415–16). Dr. Kim's only other possible basis for considering plaintiff so extremely

limited regarding handling, fingering, and feeling was his four out of five bilateral upper extremity strength notations in some of his treatment notes with plaintiff, and plaintiff's subjective reports of arm weakness, dropping things, and pain. (AR 323–29, 413–19). The ALJ assessed that four out of five bilateral upper extremity strength and other mildly reduced strength findings would not render plaintiff so limited. (AR 19, 21).

There was no evidence for Dr. Kim to rely on concerning the extent of plaintiff's functional limitations other than plaintiff's reports of symptoms and limitations. For example, his notes do not reflect any testing as to how much plaintiff could lift with each arm; how long she could sit, stand, or walk; and limitations on the use of her feet. As Dr. Kim noted in his January 2017 and August 2019 medical source statements, he found plaintiff very credible. (AR 336, 411). The ALJ noted that in plaintiff's physical exams she had some mild strength limitations (listed above), findings of a positive Hoffman's sign on the right side, and hypoesthesia in the right radial hand and digits but otherwise intact sensation. (AR 20). The ALJ also noted that plaintiff had full cervical range of motion, no tenderness to palpation throughout the cervical paraspinal musculature, and full shoulder range of motion and no tenderness to palpation despite some tightness in her shoulder and upper back muscles. *Id.* Plaintiff also had a normal gait and no abnormalities in her lower extremities or back. *Id.* Furthermore, some physical exams indicated five out of five strength in her bilateral upper extremities. (AR 20, 346, 349). The ALJ found plaintiff's physical exams did not support any more limitations than that applied in the residual functional capacity analysis. (AR 20). Given that plaintiff's physical exams did not establish the extreme limitations Dr. Kim found, and there were no other diagnostic techniques applied, Dr. Kim could only have been relying on plaintiff's subjective reports of her symptoms and limitations.

36

The objective medical findings support only that plaintiff had some mild bilateral upper extremity and bilateral hand weakness and sensation limitations, and some *cervical* spine issues. Dr. Kim opined that plaintiff was incapable of even low stress jobs; could not use her feet occasionally to push and pull leg controls; and could *never* stoop or turn her head side to side or up and down. (AR 334–35, 410–11). These are just examples of some of Dr. Kim's extreme limitations that have no basis in the objective medical evidence and could only have been based on plaintiff's subjective reports. Accordingly, a reasonable person could conclude that Dr. Kim seemed to rely on and accept as true most, if not all, of plaintiff's reports of her symptoms and limitations. The objective medical evidence and even Dr. Kim's own (limited) physical exams did not support the extreme limitations Dr. Kim indicated. Therefore, the ALJ's assertion that Dr. Kim seemed to rely heavily on and accept plaintiff's subjective reports of her symptoms and limitations is supported by substantial evidence.

> iv.   *The ALJ's Assertion that Dr. Kim's Opinions Are Extreme in Light of his Own Treatment Notes Is Supported by Substantial Evidence*

The ALJ gave Dr. Kim's opinions "very little weight as they are extreme in light of Dr. Kim's own treatment notes *and the medical evidence of record as a whole including her only treatment as medications.*" (AR 21) (emphasis added). Dr. Kim's treatment notes reveal that he did not conduct physical exams regarding plaintiff's bilateral upper extremities except in some of the appointments between September 2015 and November 2016, and in January and August 2019. (AR 323–29, 413–19). In those appointments Dr. Kim found that plaintiff had four out of five bilateral upper extremity strength. (AR 324–27, 413, 415). The ALJ considered this finding of a modest reduction in upper extremity strength and determined that it would not support the extreme limitations indicated by Dr. Kim. (AR 21). The ALJ also found that Dr. Kim's assessment in the August 2019 statement that plaintiff had polyarthritis in both her hands lacked

37

any evidence in the record, including from Dr. Kim's treatment notes, which never discuss arthritis in plaintiff's hands. (AR 21, 323–29, 413–19). Also, no lab work or x-rays confirmed arthritis in plaintiff's hands. *Id.* Dr. Kim indicated that plaintiff was incapable of handling low stress jobs (AR 334, 409), but nothing in the record (including Dr. Kim's treatment notes) indicates plaintiff would have such an extreme limitation regarding work stress.

Dr. Kim's extreme limitations regarding plaintiff's ability to reach, handle, finger, feel, and push and pull with bilateral upper extremities have been noted above. *See* AR 335, 410. But the physical exams indicated only occasional findings of slightly reduced hand and finger strength ranging from four out of five to "5-/5," a single vague finding of bilateral hand weakness, a single notation of poor fine motor movements bilaterally, two findings of positive Hoffman's sign on the right, and one mention of hypoesthesia of the right radial hand and digits with sensation otherwise intact. (AR 20, 321, 324–27, 346, 349, 413, 415). The ALJ considered these notations along with the other record evidence and determined that Dr. Kim's extreme limitations concerning plaintiff's upper extremities was not supported. *Id.*

Furthermore, Dr. Kim indicated plaintiff could not occasionally use her feet to push and pull leg controls (AR 334, 409), but nothing in his treatment notes or the record indicates any issues with plaintiff's bilateral lower extremities except a subjective report of extreme right leg and/or foot pain from November 2016 in the context of an apparent urinary tract infection, a single subjective report of leg swelling and poor balance in January 2017, and a vague report of imbalance when ambulating in October 2017. (AR 321–22, 327, 349).

The ALJ actually did give Dr. Kim's opinions about plaintiff's lifting ability some weight, as opposed to very little weight, in part because of Dr. Kim's role as plaintiff's primary care physician for several years. (AR 21). Although Dr. Kim also wrote in some treatment notes

38

that plaintiff had difficulty or an inability to lift more than ten pounds, it is not clear if that is based on the results of a physical exam conducted by Dr. Kim or based on plaintiff's reports to Dr. Kim. (AR 323–24, 326, 328). Plaintiff reported to the ALJ that she could lift up to fifteen pounds. (AR 53). Dr. Kim also noted that plaintiff dropped things, but that appeared to be based on plaintiff's subjective reports. (AR 413, 415, 417–18). The ALJ found that the only consistent finding on exams was four out of five bilateral upper extremity strength. (AR 21). The ALJ also noted that plaintiff's cervical spine had full range of motion, there was no indication of problems with the rest of plaintiff's spine, and plaintiff had full strength in her bilateral lower extremities. *Id.* The ALJ therefore found plaintiff could lift and/or carry twenty pounds occasionally.[14] *Id.*

Plaintiff mischaracterizes Dr. Kim's statements and notes regarding the limitations caused by the side effects of her opioid medication. Plaintiff argues that Dr. Kim reported that plaintiff's medication left her unable to complete even household chores due to the drowsiness and memory and judgment impairments. (Docket no. 18 at 8). Plaintiff did not provide a citation. *Id.* In the prior paragraph plaintiff had cited to AR 413. *Id.* In those treatment notes Dr. Kim stated:

> "Reports 10/10 intermittent pain. Keeps her up most nights when not
> taking pain medications. Frequent awakenings from sleep secondary to pain even
> after taking medications. Pain management requires opiod [sic] medications that
> can cause drowsiness and memory and judgment impairment. Frequently will
> drop cups, items from hand. Unable to do basic household chores/cleaning,
> cooking, laundry. Unable to work secondary to severe pain and weakness in both
> upper extremities."

(AR 413). Dr. Kim did not report that plaintiff's opioid medication side effects caused her issues with household chores. *Id.* Rather, plaintiff's alleged inability to do chores appears related to

---

[14] The ALJ relied on the expertise of the state agency specialists in making her determinations concerning the limitations on plaintiff's lifting/carrying restrictions and the other limitations to the restriction to light duty work. (AR 21–22, 76–79, 91–94).

plaintiff's alleged pain and weakness in her upper extremities. *Id.* Furthermore, in Dr. Kim's first medical source statement, he only listed drowsiness caused by plaintiff's medication as a basis for plaintiff not being able to travel alone. (AR 334). In the August 2019 medical source statement, he listed drowsiness from opioid medication as a limitation preventing plaintiff from traveling alone and as a side effect that interfered with daily life, but he did not list judgment or memory impairments as a side effect that interfered with plaintiff's daily life. (AR 409–410). Furthermore, plaintiff testified that while she took ibuprofen every day, she took opioid medication only twice a week. (AR 55). While Dr. Kim stated that in general opioid medication "can cause drowsiness and memory and judgment impairments" (AR 413), there is nothing in the record that indicates plaintiff has any memory or judgment impairment as a result of her limited use of opioid medication.

Accordingly, a reasonable person could conclude that Dr. Kim's "opinions are extreme in light of [his] own treatment notes and the medical evidence of record as a whole including her only treatment as medications." Therefore, the ALJ's assertion that Dr. Kim's opinions are extreme in light of his own treatment notes is supported by substantial evidence. Furthermore, as detailed in this and the prior subsections, all of the ALJ's reasons for giving very little weight to Dr. Kim's opinions are supported by substantial evidence. Plaintiff's attempts to isolate specific phrases the ALJ used in her reasoning are not persuasive. The ALJ's reasons for giving Dr. Kim's medical opinions very little weight are supported by substantial evidence, particularly in the context of the ALJ's full explanation. Accordingly, the undersigned recommends a finding that the ALJ's decision to give very little weight to Dr. Kim's opinions is supported by substantial evidence.

## V.  CONCLUSION

Based on the foregoing, it is recommended that the court finds that the Commissioner's final decision denying plaintiff benefits for the period of March 9, 2016 through the date of the ALJ's decision is supported by substantial evidence, and that the proper legal standards were applied in evaluating the evidence.  Accordingly, the undersigned recommends that plaintiff's motion for summary judgment (Docket no. 17) be denied, the Commissioner's motion for summary judgment (Docket no. 20) be granted, and the final decision of the Commissioner be affirmed.

## NOTICE

Failure to file written objections to this report and recommendation within fourteen (14) days after being served with a copy of this report and recommendation may result in the waiver of any right to a *de novo* review of this report and recommendation and such failure shall bar you from attacking on appeal any finding or conclusion accepted and adopted by the District Judge except upon grounds of plain error.

Entered this 8th day of July, 2021.

_____/s/_____
John F. Anderson
United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

41